THOMEE (KOONES v.). See Case No. 7,-926.

THOMES (UNITED STATES v.). See Cases Nos. 16,481 and 16,482.

THOMPKINS (UNITED STATES v.). See Case No. 16,483.

## Case No. 13,934.

### Ex parte THOMPSON.

[1 Flip. 507; 15 Am. Law Reg. (N. S.) 522; 9 Chi. Leg. News, 19; 1 Cin. Law Bul. 235; 24 Pittsb. Leg. J. 47.] [1]

District Court, W. D. Tennessee. Feb. 24, 1876.

HABEAS CORPUS—IN STATE CUSTODY—INDICTMENT FOR LARCENY—TAKING UNDER FEDERAL REPLEVIN — WRITS.

1. Under the writ of habeas corpus the courts of the United States have power to discharge persons while under arrest by state officers, if it appears that they are held in custody under a state law which attempts to punish them for executing a law of the United States, or where the act for which they are held was done under process of a federal court.

2. If, however, a party be in the custody of an officer of the state government under an indictment for larceny, and as a justification for the act complained of sets up the fact of the issue of a writ of replevin from the United States court, the last named court on habeas corpus will inquire into the facts: and if it should appear that the writ was obtained fraudulently, with the purpose of carrying off property, the court will remand the relator to the custody of the state officers.

3. Where a writ is on its face regular, it is a justification to the officer to whom it is addressed for everything he may lawfully do under it; but a party who has procured a writ by fraud, does not come within the rule.

Waddy Thompson was arrested for larceny and for horse stealing by the grand jury of Shelby county. There were several indictments. This writ was issued, directing his body to be brought before the judge then holding the term of the federal court. The sheriff produced the relator, and returned that he held him on the indictments. Thompson claimed that he was the agent of

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission. 24 Pittsb. Leg. J. 47, contains only a partial report.]

his mother-in-law—one Mrs. Wilkerson, of St. Louis—and acting with an attorney of that city—one Arnett—had been endeavoring to obtain possession of certain goods and chattels unlawfully detained by parties at Memphis; that Arnett made the oath required by the statute, gave a bond with Elijah Smith and Benjamin F. Carroll as sureties; that thereupon process was issued to the marshal requiring him to take possession of the property mentioned therein, and deliver to plaintiff or her agents; that a part of the goods thereunder were taken and delivered to Arnett; that Hendrix, one of the defendants, then made oath before the clerk of the court that the bond given was insufficient, and obtained an order from the district judge which suspended further proceedings; that horses and other property taken into possession by Arnett had been placed aboard a steamer to be delivered to his principal in Missouri; that after said boat had been landed on the Arkansas shore, a short distance above Memphis, Hendrix, with a body of armed men, came on board, and by intimidation induced Arnett and the relator to return the property to them, under an agreement, however, that the title to same should be settled by civil suits then pending. Relator further alleged that, notwithstanding the writ had been regularly issued and executed, the defendants in the suit of replevin had procured indictments against himself and Arnett, and against the sureties for perjury and larceny; that they were intended to hinder and delay his principal in prosecuting her replevin suit, and to oust the circuit court of the United States of its rightful jurisdiction, and to force the plaintiff into the state court, where it was hoped to obtain an undue advantage over her by reason of local influence; that after relator had given bonds for his appearance on the trial of these indictments, Hendrix, Carter & Co., defendants in replevin suit, had commenced an action against him and his principal for malicious prosecution. It was further alleged that the criminal court of Shelby county had no jurisdiction in the case; that he was unjustly restrained of his liberty; and if guilty of any wrongful act whatever, it was against the peace and dignity of the United States. Relator claimed that the federal court had exclusive jurisdiction in the matter, and that he had been guilty of no crime whatever. The facts, however, did not support the allegations of relator. It was shown that the sureties in the replevin suit were perfectly worthless, and the facts looked strongly towards a deliberate attempt on the part of Thompson to possess himself of the property in controversy, and dispose of it before it could be reclaimed, or any legal questions affecting the title could be disposed of. After other property had been taken by the marshal into possession, the order came suspending further proceedings.

T. W. Brown, W. C. Folkes, and J. J. Du Bose, for relator.

L. E. Wright, L. B. Horrigan, and L. B. McFarland, contra.

BROWN, District Judge. It is claimed by the relator that as the sheriff made no answer to the facts set forth in this petition, they are to be taken as true, and that he is therefore entitled to his discharge. I think, however, he misapprehends the law on this point. The petition is simply the basis upon which the writ is issued. No copy of it is required to be served upon the respondent in the writ, who is required to make his return to the writ itself, and not by way of answer to the petition, which has performed its office as soon as the fiat is signed. A return may be traversed or confessed by way of affidavit or oral testimony, but I know of no practice requiring an answer to be made to the petition itself. It would have been proper for the relator to confess and avoid the return by repeating in his denial the facts set up in the petition. This is evidently contemplated by section 760, hereafter quoted, though I know of no practice requiring it to be done. The testimony was taken as if the issue had been made upon the return, and as no objection was interposed to this course until the argument of the case, I shall proceed to dispose of it as if an issue had been made by the pleading.

By section 753 of the Revised Statutes, "the writ of habeas corpus shall in no case extend to a prisoner in jail, unless where he is in custody * * * for an act done or omitted, in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof." Although the words used are those of exclusion, there is no doubt of the power of this court to issue a writ of habeas corpus in cases falling within the above provisions.

By section 754, application must be made "by complainant in writing, signed by the person for whose relief it is intended, setting forth the facts concerning the detention of the party restrained, in whose custody he is detained, and by virtue of what claim or authority, if known."

By section 760, the petitioner "may deny any of the facts set forth in the return, or may allege any other facts that may be material in the case. Said denials or allegations shall be under oath."

By section 761, the judge "shall proceed, in a summary way, to determine the facts in the case by hearing the testimony and argument, and thereupon to dispose of the party as law and justice require."

The section first above quoted is substantially a re-enactment of the act of 1833, commonly known as the "Force Bill" [4 Stat. 634], and was adopted in view of the nullification laws of South Carolina, by which an attempt had been made to punish officers of the United States for executing the laws of congress within that state. But it is now settled that this act gives relief to one in state custody, not only when he is held under a law of the state which seeks expressly to punish him for executing a law or process of the United States, but also when he is in such custody under a general law of the state which applies to all persons equally, where it appears he is justified for the act done, because done in pursuance of the process of a United States court. U. S. ex rel. Roberts v. Jailer [Case No. 15,463]. At the same time the power given to the federal courts thus to arrest the arm of the state authorities, and to discharge a person held by them, is one of great delicacy, and should only be exercised where it clearly appears that justice demands it. Such power has rarely been invoked, except under circumstances tending strongly to show that the state was about to use its authority to oppress the party imprisoned in defiance of the laws of the general government. Nothing could render the act more justly odious than to permit the writ of habeas corpus to be employed to relieve a party from the legal consequences of crime against the sovereignty of a state.

If it appears, however, that the relator was justified by the process of this court in doing what he has done, the sections above quoted authorize and require his discharge. The testimony, taken at considerable length, reveals substantially the following facts:

The relator, who was a son-in-law of Mrs. Wilkerson, holding a general power of attorney from her, came to Memphis from Missouri in the month of October, 1874, accompanied by one Arnett, an attorney-at-law at St. Louis, for the purpose of asserting her claim to the property covered by the writ of replevin. With the view of hastening the disposition of the case, it was conceded by the learned counsel for the state that the relator, in good faith, supposed that Mrs. Wilkerson was entitled to the possession of the property covered by the writ. On arriving at Memphis, he and Arnett put up at the Commercial Hotel, where they first met Carroll, who afterwards became one of the sureties upon the replevin bond. * * *

(The means used for obtaining worthless securities on the replevin bond were criticised at this place by his honor.)

After one or two ineffectual efforts he finally procured the services of an attorney, who drew an affidavit sworn to by Arnett, claiming the possession of the stock of liquors and safe and contents in the store of Hendrix, Carter & Co., the entire stock in trade of a firm of nurserymen, and three horses belonging to parties not connected in any way with the other defendants, though the horses had been purchased of Hendrix, Carter & Co. It may also be observed here that Hendrix, Carter & Co. were in no way connected with the owners of the nursery, and that plaintiff proceeding properly would

have been compelled to bring at least three, and probably four or five, separate suits to obtain possession of these distinct parcels. Upon this affidavit a sweeping writ of replevin was issued against defendants, commanding the marshal to take possession of all the property named in the writ, and to deliver the same to the plaintiff or her agent. Taking Arnett and his two sureties to the clerk's office, a bond was signed, prior to the issuing of the writ, by Arnett, as attorney for the plaintiff, by Homer B. Carroll, signing his name as Benjamin F. Carroll, and by Elijah Smith, whose true name, and, indeed, whose very existence is unknown. Each of these sureties swore that he was worth the sum of $30,000 in real estate in Shelby and Tipton counties. This was done in the presence and by direction of Thompson, who knew perfectly their utter insolvency. Shortly afterwards, Arnett advised Carroll to get out of town as soon as possible, which he proceeded to do by hiring a skiff to take him across the river. To secure the speedy service of the writ and transportation of the property, relator hired a steamboat plying between Memphis and Mound City, Arkansas, to wait over her usual time of departure, promising to pay ten dollars an hour for her detention. Deputies were dispatched from the marshal's office to different parts of the city where the property covered by the writ was lying. Six furniture wagons were sent to the nursery, and about a thousand pots of flowers, besides knives, forks, and spoons, and other articles, were loaded upon them and hurried away to the steamer, which was lying in waiting to take them across the river. Several horses were seized by another deputy, who at once drove them on board the steamboat. Fifty or sixty drays were sent to the store of Hendrix, Carter & Co. for the purpose of removing their entire stock in a similar way, and loading it upon the boat. The relator formerly had a desk in their establishment, knew the office hours of the partners, and instructed the marshal not to go there until the bookkeeper had gone away and locked the safe, and the steamer was on the point of departure. When the marshal announced his intention to Hendrix of seizing all the goods in his establishment, Hendrix asked for a little time, went to the clerk's office to look at the bond, satisfied himself the sureties were insolvent, and made affidavit of the fact, when the district judge was telegraphed to to stop the proceedings.

The marshal refused to place the property on the boat, but put custodians in charge during the night. His suspicions were excited none too soon. Great anxiety was manifested by Thompson to get possession of his stock, but finding himself foiled, the boat was compelled to put off without it. It proceeded to Mound City about sun down, with Thompson, Arnett, and Carroll, who had dismissed his skiff, on board. After arriving at Mound City, some of the defendants made up a party, hired a steam tug, went in pursuit, and compelled the return of the property. (That is, the property on board—knixes, forks, mules, etc.—not the stock of Hendrix, Carter & Co., as that was not on board.—Rep.) Relator afterwards returned to Memphis, saw the counsel employed by Hendrix, Carter & Co., confessed to him the bond was bogus and fraudulent, said they had him where he meant to get them, and promised if they would let him out he would furnish information to hold the clerk and marshal. I take pleasure in saying there is not the slightest evidence to show that these officers or their deputies acted corruptly or in bad faith, although in view of the magnitude of the bond a little more care in approving it would have been commendable. The writ of replevin was soon after dismissed, and his claim to the property abandoned.

This is but a bare outline of the facts fully proved—facts which the relator made but feeble attempt to deny. I am forced to the conclusion that it is a case of gross and infamous fraud practiced upon the court.

It is claimed by the relator, however, that admitting this to be true, he is still entitled to his discharge, inasmuch as the writ of replevin was valid upon its face. There is no question that a writ valid upon its face will protect the officer executing it, notwithstanding it may have been irregularly issued, or may be voidable for want of jurisdiction. There is a clear distinction, however, between the officer who executes the writ and the party who procures it to be issued; as against the latter, it may be shown to be void from facts not appearing upon its face. From a multitude of cases drawing this distinction, I cite the following:

Savacool v. Boughton, 5 Wend. 173; Loder v. Phelps, 13 Wend. 48; Adkins v. Brewer, 3 Cow. 206; Whitney v. Shufelt, 1 Denio, 594; State v. Weed, 1 Fost. [N. H.] 262; Rogers v. Mulliner, 6 Wend. 597; Taylor v. Trask, 7 Cow. 249.

By the Code of Tennessee, before a writ of replevin can be issued, a bond must be filed in double the value of the property covered by the writ. Whether the writ is totally void without such bond, it is perhaps unnecessary to consider. There is no doubt that a writ of attachment issued without such bond, where the statute requires it, is wholly void (see Drake on Attachments, etc.); and it is presumed that the same rule would be held to apply to writs of replevin, although in some states, where a bond is not required before the issuing of the writ, it is held that the writ is not thereby invalidated if the bond is executed before the property is delivered to the plaintiff. There is a clear distinction between the statutes which require the bond to be executed be-

-fore the property is delivered over, and those which require it before the issuing of the writ. In this case no bond was ever given. It is not merely a case of insufficiency of sureties, which may be renewed by order of the court. The relator procured the execution of the bond by sureties whom he knew to be utterly irresponsible, and at least one of whom forged the signature of a fictitious person.

The position assumed by relator is, that if the writ upon its face authorized the taking, which is the subject of the larceny for which he is indicted, he "is entitled to his discharge, notwithstanding the writ was procured by perjury, and used for the purpose of committing a larceny. Counsel cannot have fully apprehended the consequences of this doctrine. May a deputy marshal holding a capias of this court deliberately murder the party he is seeking to arrest? There is no general power in the federal courts to punish murder, and if discharged from the custody of the state, his crime would go practically unpunished. This court, I think, is bound to inquire into the legality of the use as well as of the validity of the process itself. This was the view evidently taken by the learned judge for the district of Kentucky in the Roberts' Case, above cited.[2]

In Com. v. Low, Thacher's Cr. Cas. 477, it was held that, if a man having a right of action makes use of a process which he knows he has no right to adopt, to get the property of his debtor, and with intent to defraud him, it is larceny.

It is well settled that a combination of two or more to accomplish a lawful purpose by unlawful means is indictable as a conspiracy. Says Lord Hale, P. C. 507: "A. has the mind to get the goods of B. into his possession, privately delivers an ejectment, and obtains judgment against a casual ejector, and thereby gets possession and takes the goods. If it were animo furandi, it is larceny." So Lord Coke, 3 Inst. 108: "If a man seeing the horse of B. in his pasture, and having a mind to steal him, cometh to the sheriff, and, pretending the horse to be his, obtaineth the horse to be delivered to him by replevin, yet this is a felonious and fraudulent taking."

I have not lost sight of the concession in this case, that relator supposed he was entitled to the possession of this property. The question here is not whether he was entitled to the possession of the property, nor whether he was guilty of larceny in obtaining possession, not even whether he was entitled to possession, but whether he was justified by his writ in obtaining this possession. Now, nothing is better settled in the law of trespass than that an officer entitled to levy upon property becomes a trespasser ab initio by an abuse of the process. I am sat-

isfied in this case that the relator commenced this suit, not for the purpose of asserting a bona fide claim to the property, but of spiriting it away under the forms of law, and disposing of it before proceedings could be taken for its reclamation. It would be a strange interpretation of the law if, having been guilty of forgery, fraud, and subornation of perjury in procuring the process of this court, he could still claim to be protected by it in carrying out his schemes. I hold then, that, although the marshal was protected by this writ in what he did. in execution thereof, yet as to the relator in this case it was fraudulent and void, and that so far from being entitled to protection by this court, his case should be laid before the next grand jury of this district for such action as it may see fit to take, and the district attorney is directed to see that this is done; provided, however, that no action be taken on any indictment until he shall have been discharged by a state court.

It results that the prisoner must be remanded to the custody of the sheriff of Shelby county.

---

[2] See Case of U. S. ex rel. v. Weeden [Case No. 14.412], where the ruling in the Roberts Case has been modified.

